IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AMTAX HOLDINGS 436, LLC and PROTECH 2004-D, LLC, | |
| Plaintiffs, | Case No. 23-cv-14409 |
| v. | Judge Mary M. Rowland |
| FULL CIRCLE VILLAGEBROOK GP, LLC, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs AMTAX Holdings 436, LLC ("AMTAX") and Protech 2004-D, LLC ("Protech" and, collectively with AMTAX, the "Limited Partners") brought this declaratory judgment action against Defendant Full Circle Villagebrook GP, LLC ("Full Circle"). Full Circle asserts a counterclaim for breach of contract and seeks a competing declaratory judgment. Before the Court are cross-motions for summary judgment on the proper methodology for calculating the price Full Circle must pay to purchase the Limited Partners' interests. For the reasons stated below, Full Circle's partial motion for summary judgment [32–33] is granted, and the Limited Partners' motion for summary judgment [34] is denied.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

1

A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls the facts that are material. *Id*. After a "properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id*. at 250 (quoting Fed. R. Civ. P. 56(e)).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id*.

When cross-motions for summary judgment are filed, "[t]he ordinary standards for summary judgment remain unchanged [and] we construe all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). "Cross-motions must

2

be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute." *Bloodworth v. Vill. of Greendale*, 475 Fed. Appx. 92, 95 (7th Cir. 2012).

## BACKGROUND[1]

The Court assumes familiarity with its previous summary judgment decision in *Full Circle Villagebrook GP, LLC v. Protech 2004-D, LLC, et al.*, No. 20-CV-07713, 2023 WL 6049925 (N.D. Ill. Sept. 15, 2023) ("*Full Circle I*").

### I. The Parties

The Villagebrook Apartments Limited Partnership (the "Partnership") has four partners. [32-2] ¶ 3. Defendant Full Circle[2] is the General Partner and its affiliate, Full Circle Holding, LLC ("FCH"), is the Other Limited Partner. *Id.* Plaintiffs AMTAX and Protech (collectively, the "Limited Partners") are, respectively, the Investor Limited Partner and Special Limited Partner of the Partnership. *Id.*

The Partnership owns and operates a 189-unit affordable housing complex in Carol Stream, Illinois (the "Project" or "Property") that was financed and developed in accordance with the Low-Income Housing Tax Credit ("LIHTC") program. [32-2] ¶ 1; [36] ¶ 1. The Project is a "qualified low-income housing project" eligible for federal income tax credits and other tax benefits under Section 42 of the Internal Revenue

---

[1] The facts are from the parties' Rule 56.1 statements and are undisputed unless otherwise noted.

[2] Full Circle is wholly owned by Full Circle Communities, Inc. ("FCC"), a 501(c)(3) non-profit entity whose mission is to create and preserve affordable housing. [32-2] ¶ 4.

3

Code, that are earned during a fifteen-year "Compliance Period." [36] ¶ 2. The Compliance Period for the Project ended on December 31, 2019. *Id.* ¶ 12.

## II. The LPA's Option

The Partnership and the rights and obligations of Full Circle and the Limited Partners are governed by an Amended and Restated Agreement of Limited Partnership, as amended (the "LPA"), that in turn is governed by Illinois law. [36] ¶ 10.

Section 7.4.J of the LPA provides Full Circle with an option (the "Option") to purchase the Limited Partners' interests in the Partnership after the Compliance Period "for cash, based on the amount they would receive if the property were sold at the fair market value (as of the date of the purchase and as determined below with a 4% brokerage fee and as otherwise determined herein), and the proceeds of such sale were applied in accordance with this Agreement" (the "Option Price"). *Id.* ¶ 11. The section continues: "[t]he General Partner [Full Circle] shall select one appraiser from LaSalle Bank National Association's or Deutsche Bank Berkshire Mortgage's approved list. This appraiser shall serve as the only appraiser … ." *Id.* "If, however Deutsche Bank Berkshire Mortgage or LaSalle Bank National Association do not have an approved list, the General Partner [Full Circle] may select an appraiser subject to the approval of the Investor Limited Partner [AMTAX], provided such approval shall not be unreasonably withheld." *Id.*

On November 4, 2020, Full Circle sent the Limited Partners a letter stating it was exercising its Option under Section 7.4.J to purchase the Limited Partners' interests

4

in the Partnership based on an appraisal performed by Newmark Knight Frank. [32-2] ¶ 61; [32-6]. The parties disputed, among other things, whether Full Circle complied with the LPA's appraisal provisions. *See Full Circle I*, 2023 WL 6049925, at *2–3. On September 15, 2023, the Court issued a memorandum opinion and order denying Full Circle's motion for summary judgment in its entirety and granting the Limited Partners' cross-motion for summary judgment based on Full Circle's failure to seek the Limited Partners' approval of the appraiser selected by Full Circle. *Id.* at *6.[3]

Ten days later, on September 25, 2023, Full Circle sent the Limited Partners a letter stating it was exercising its Option under Section 7.4.J to purchase their interests in the Partnership. [32-2] ¶ 66; [32-43]; [36] ¶ 13. Full Circle's letter also requested that the Investor Limited Partner, AMTAX, approve one of four proposed appraisers selected by Full Circle. [32-43].

**III. The Claims**

The Limited Partners filed this action for a declaratory judgment that Section 7.4.J of the LPA requires: (1) the Option Price to equal the amount the Limited Partners would receive if the Property were sold and residual sale proceeds were distributed pro rata based on the partners' positive capital account balances; and (2) the General Partner (Full Circle) to select an appraiser from CBRE Group, Inc. or Jones Lang

---

[3] Because the Limited Partners prevailed on the threshold issue regarding the validity of Full Circle's purported exercise of its Option, the Court did not reach the parties' underlying dispute concerning how to value the Limited Partners' interests in the Partnership under Section 7.4.J. *Full Circle I*, 2023 WL 6049925, at *7.

LaSalle, Inc. who specializes in LIHTC-related valuations and has not previously performed work for the General Partner or its litigation counsel, subject to AMTAX's approval, and to close on the purchase of the Limited Partners' interests within twelve months.[4] [1] ¶¶ 37, 43.

Full Circle filed counterclaims for breach of contract against the Limited Partners and for a declaratory judgment that, among other things, that the Option Price be calculated using the amount the Limited Partners would receive pursuant to a hypothetical sale of the Property at the appraised fair market value and a distribution of proceeds in accordance with Section 6.2.B of the LPA, as opposed to a liquidation of the Partnership and distribution of proceeds in accordance with Section 6.3.C of the LPA. [18] ¶¶ 186–95, 203.

## ANALYSIS

Full Circle and the Limited Partners each move for summary judgment on the issue of the proper methodology under Section 7.4.J of the LPA for calculating the price that Full Circle must pay to purchase the Limited Partners' interests in the Partnership. [25].

I.  **Contract Interpretation**

The threshold issue is whether the contract language at issue is ambiguous. *See Bright Horizons Children's Centers, LLC v. Riverway Midwest II, LLC*, 931 N.E.2d

---

[4] This case was reassigned pursuant to Local Rule 40.4, without objection, after the Court found it to be related to *Full Circle I*. [28]. The parties stipulated that they may rely on evidence adduced in connection with *Full Circle I*, and that discovery is stayed pending resolution of the cross-motions. [25].

780, 792 (Ill. App. Ct. 2010). This is a question of law for the court. *Owens v. McDermott, Will & Emery*, 736 N.E.2d 145, 153 (Ill. App. Ct. 2000).

When construing a contract under Illinois law, the Court's primary objective is to give effect to the intention of the parties. *Thompson v. Gordon*, 948 N.E.2d 39, 47 (2011). The Court looks first to the language of the contract to determine the parties' intent. *Id.* If the words in the contract are clear and unambiguous, they must be given their plain, ordinary, and popular meaning. *Id.* If the language of the contract is susceptible to more than one meaning, however, it is ambiguous, and the Court can consider extrinsic evidence to determine the parties' intent. *Id.*; *see also Bright Horizons Children's Centers*, 931 N.E.2d at 792 ("Contractual language is ambiguous when it is susceptible to more than one meaning or is obscure in meaning through indefiniteness of expression.") (cleaned up); *Lee v. Allstate Life Ins. Co.*, 838 N.E.2d 15, 24 (Ill. App. Ct. 2005) ("[E]xtrinsic evidence is admissible to explain the meaning of words in a contract only when there is an ambiguity, or the words are susceptible of different interpretations.").

Where terms of a contract are clear, "they must be enforced as written, and no court can rewrite a contract to provide a better bargain to suit one of the parties." *Owens*, 736 N.E.2d at 154. Indeed, Illinois courts "will not add terms to a contract to change the plain meaning, as expressed by the parties." *Wood v. Evergreen Condo. Ass'n*, 189 N.E.3d 1045, 1053, appeal denied, 183 N.E.3d 901 (Ill. 2021). As the Seventh Circuit has explained, "especially when dealing with a substantial contract between commercially sophisticated parties who know how to say what they mean

7

and have an incentive to draft their agreement carefully, … unambiguous contractual language must be enforced as it is written.'" *ConFold Pacific, Inc. v. Polaris Ind.*, 433 F.3d 952, 955 (7th Cir. 2006) (cleaned up).

The Limited Partners and Full Circle have not identified any language in the LPA that they contend is ambiguous. In fact, both parties agree that the relevant provisions of the LPA are unambiguous but disagree how to calculate the Option Price. *See Wolfensberger v. Eastwood*, 889 N.E.2d 635, 638 (Ill. App. Ct. 2008) ("A contract is not ambiguous … simply because the parties disagree on a provision's meaning."). The Court agrees that the contract terms are unambiguous.[5]

## II. The LPA's Option Price

Four provisions of the LPA are at issue: Section 7.4.J. (providing Full Circle the Option to purchase the Limited Partner's interests); Sections 6.2 and 6.3 (providing distributions); and Section 2.5 (providing dissolution).

The Option provision under Section 7.4.J of the LPA provides that, after the Compliance Period, Full Circle may purchase the Limited Partners' interests in the Partnership "for cash, based on the amount they would receive if the [P]roperty were sold at the fair market value . . . and the proceeds of such sale were applied *in accordance with this Agreement*" (the "Option Price"). LPA, art. VII, § 7.4.J (emphasis

---

[5] Full Circle alternatively argues that there is evidence demonstrating that the parties intended the Limited Partners to receive a ten percent residual interest in the Property and not a payment based on positive capital account balances. [32-1] at 15. Because the Court agrees with the parties that the LPA is unambiguous, it does not address Full Circle's alternative argument. *See Friedman v. Wolfspeed, Inc.*, No. 22 C 2253, 2023 WL 5852209, *4 (N.D. Ill. Sept. 11, 2023) ("[T]he court concludes that the contract is unambiguous and neither parol nor extrinsic evidence is needed or appropriate to consider determining the parties' intent.").

added). The parties dispute whether the Option Price must be calculated or "applied in accordance" with Section 6.2 or Section 6.3.B of the LPA.

The Limited Partners contend that Section 6.3.B (or "liquidation waterfall") governs the calculation of the Option Price. Section 6.3 is entitled "Liquidation," and Section 6.3.B states that "[a]ny Capital Proceeds from a Terminating Capital Transaction remaining after payment of, or adequate provision for, the debts and obligations of the Partnership shall be distributed to those Partners with positive Capital Account balances . . . in proportion to said Capital Account balances." LPA, art. VI, § 6.3. The LPA defines a "Terminating Capital Transaction" as "a Capital Transaction resulting in or involving the termination and winding up of the business of the Partnership or any other event resulting in the 'liquidation' of the Partnership within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Allocation Regulations." LPA, art. I. The Limited Partners highlight that the LPA provides that "the Partnership shall be dissolved upon . . . the sale or other disposition of all or substantially all the assets of the Partnership." LPA, Art. II, § 2.5.A. Because it is undisputed that the Property comprises substantially all the assets of the partnership, the Limited Partners argue that the sale of the Property is a "Terminating Capital Transaction" subject to the liquidation waterfall.

Full Circle responds that not all sales of the Property are a "Terminating Capital Transaction" because there is more than one set of circumstances under which the Property can be sold. For example, Full Circle asserts that the sale of the Property can be a "Terminating Capital Transaction" if it is sold as part of a liquidation and

9

dissolution of the Partnership (e.g., the Partnership were bankrupt). Alternatively, Full Circle contends that the Property can be sold before the Partnership dissolves and liquidates. In the latter scenario, Full Circle argues the sale proceeds fall under Section 6.2.B (or "sales waterfall"), entitled "Distributions of Proceeds from a Sale or Refinancing," which provides that "subject to … Section 6.3 …, any Capital Proceeds" are distributed in the following order of priority:

> First, to the payment of all debts and liabilities of the Partnership excluding those owed to Partners, and to the establishment of any reserves reasonably necessary for contingent unmatured or unforeseen liabilities or obligations of the Partnership;
>
> Second, to the payment of the Asset Management Fee of such year and for previous years as to which the Asset Management fee has not been paid in full;
>
> Third, to the payment of any outstanding Management Fee to the Management Agent (including, without limitation, any unpaid Subordinated Management Fee), and then to the Deferred Developer Fee, the deferred General Contractor Fee and then to the repayment of any Subordinated Loans of the General Partner or a Guarantor;
>
> Fourth, in the event of a sale, a priority distribution to the Investor Limited Partner an amount equal to the sum of (i) all federal, state and local income taxes which would be payable by the Investor Limited Partner and its members as a result of the sale of the Project giving rise to such distribution (calculated as if the special allocations pursuant to Section 6.5T had not been made and the deductions resulting from the Incentive Management Fee have not been taken), less any refinancing proceeds (including release of any principal reserve fund under the Project Documents) previously distributed to the Investor Limited Partner and (ii) any tax liability incurred by the Investor Limited Partner and its members as a result of the receipt of the distribution described in subclause (i) of this Clause Fourth (collectively, "Exit Taxes"); and
>
> *Fifth, the balance, if any, shall be distributed as follows: ten percent (10%) to the Investor Limited Partner (less any Exit Taxes paid to the Investor Limited Partner pursuant to clause Fourth above) but not an*

10

> *amount less than zero; .01% to the Special Limited Partner; .01% to the General Partner; and 89.98% to the Other Limited Partner plus any Exit Taxes paid to the Investor Limited Partner pursuant to clause Fourth above to the extent such amount reduces the amount distributable to the Investor Limited Partner pursuant to this clause "Fifth".*

LPA, Art. VI, § 6.2 (emphasis added). Because "Capital Proceeds" are "the gross proceeds resulting from any Capital Transaction" (LPA, Art. I), and the sale of the Property is a "Capital Transaction" or "sale … of all or substantially all of the assets of the Partnership" (*id.*), Full Circle argues that the Option Price is a hypothetical sale that falls under the sales waterfall.

The Court agrees with Full Circle that the Option Price is governed by Section 6.2.B. Section 2.5 provides that "[u]pon dissolution of the Partnership…, the General Partner … shall cause the cancellation of the Certificate and *liquidate* the Partnership assets and apply and *distribute the proceeds thereof in accordance with Section 6.3.*" LPA, Art. II, Sec. 2.5.B (emphases added). Thus, the LPA distinguishes the sale of the Property and the subsequent dissolution and liquidation of the Partnership. Consequentially, the sale and distributions of proceeds from the sale are distinct and separate from a subsequent dissolution and liquidation of the Partnership. *See Centerline/Fleet Housing Partnership, L.P.–Series B v. Hopkins Court Apartments, L.L.C.*, 195 A.D.3d 1375, 1377 (N.Y. App. Div. 2021) ("The fact that a sale of the project triggers a dissolution, and thereafter a liquidation, does not mean that the sale and its proceeds are automatically included in the subsequent liquidation.").

11

The Limited Partners attempt to harmonize the two sections by asserting that Section 6.2.B would only be superseded by Section 6.3 where: (1) one or more partners has a positive capital account balance at the time of the sale; and (2) the pro rata ratio of the partners' positive capital accounts differs from the residual split in Section 6.2.B. Further, the Limited Partners highlight that Section 6.2.B states that it is "subject to the provisions of Section 6.3."

First, the LPA does not provide that Section 6.2.B is superseded by Section 6.3.B if a partner has a positive capital account, and the ratio of the partners' positive capital differs from the residual split. *See Evergreen Condo. Ass'n*, 189 N.E.3d at 1053 (courts will not "add terms to a contract to change the plain meaning, as expressed by the parties"); *see also ConFold Pacific, Inc.*, 433 F.3d at 955. Second, Section 6.3.C provides the "parties intend that, as a result of the application of the allocation and distribution provisions contained in this Article VI, any Capital Proceeds from a Terminating Capital Transaction will be distributed in the same manner as Capital Proceeds are distributed under the provisions of Section 6.2.B." LPA, Art. VI, § 6.3.C. Section 6.3.C goes on to provide that, in the event a distribution of Capital Proceeds from a Terminating Capital Transaction would not result in a 90/10% distribution, it would be considered a "defect" for which the parties included a curative mechanism to prevent. *Id.* This further demonstrates the parties' intent that Section 6.2.B applies here. *See Health Pros., Ltd. v. Johnson*, 791 N.E.2d 1179, 1193 (Ill. App. Ct. 2003) ("Courts will construe a contract reasonably to avoid absurd results."). Overall, the Limited Partners' interpretation of the LPA does not harmonize the LPA's provisions.

12

*See, e.g., Saugatuck, LLC v. St. Mary's Commons Assocs., L.L.C.*, No. 19-CV-217 (SIL), 2022 WL 3699484, at *8 (E.D.N.Y. Aug. 26, 2022) (finding sales proceeds waterfall was not subordinated by liquidation provisions because the "LPA is devoid of any language that explicitly conditions [the] proceeds-allocation waterfall on a payout commensurate with the parties' capital accounts").

The Court also rejects the Limited Partners argument that their contract interpretation is "compelled by the requirements of the Internal Revenue Code and accompanying Treasury Regulations[.]" [43] at 12. The Limited Partners point to a Treasury Regulation that requires "[u]pon liquidation of the partnership (or any partner's interest in the partnership), liquidating distributions are required in all cases to be made in accordance with the positive capital account balances of the partners." 26 C.F.R. § 1.704-1(b)(2)(ii)(b)(2). The LPA provides that "[t]he foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with the Allocation Regulations [i.e., 'the Treasury Regulations issued under Sections 704(b) and 752 of the [Internal Revenue] Code'] and shall be interpreted and applied in a manner consistent with such Allocation Regulations." LPA, Art. I, Art. IV, § 4.3.D. However, the regulations do not apply to the distributions of sale proceeds because the Court finds that the LPA's unambiguous language makes a distinction between sale proceeds and subsequent liquidating distributions. *See, e.g., St Mary's*, 2022 WL 3699484, at *8 (rejecting argument that a "failure to distribute sale proceeds in a manner proportional to the

13

parties' respective capital accounts would somehow run afoul of both the federal tax code and the intentions of the LPA's original parties").

## CONCLUSION

For the stated reasons, Defendant's motion for partial summary judgment [32–33] is granted and Plaintiffs' motion for summary judgment [34] is denied.

E N T E R:

Dated: June 18, 2024

*Mary M Rowland*

MARY M. ROWLAND
United States District Judge